Okay, our last case of the day is Cornelius v. CVS Pharmacy, number 23-2961. Good morning, and may it please the Court, Alex Leone on behalf of the Appellant Michelle A. Cornelius, and respectfully requesting three minutes for rebuttal. Okay, that'll be granted. Thank you. Appellant Michelle A. Cornelius respectfully submits that reversal is appropriate in this matter under this Court's opinion in Lloyd v. Hovenza, which was vindicated by the Supreme Court's opinion in Smith v. Vizieri. And we believe that that much is probably not in question at this point, given the last footnote of the appellee's brief. A more pertinent question for the Court could potentially be what instructions on remand would be appropriate. And we think that the clearest and most legally supported instruction would be that Appellant Michelle A. Cornelius's election under the Act, which is 9 U.S.C. 402, is effective, which would mean that she is permitted at her election not to arbitrate this dispute. We think that 9 U.S.C. section 402 does straightforwardly apply, based on the requirement or the element that a person alleging conduct constituting a sexual harassment dispute is permitted to opt out of arbitration. There is a question over whether this dispute would qualify or what this dispute even is, but we do respectfully submit that the effective date of the Act makes clear that as of March 3, 2022, any dispute or claim would fall under the Act. And so in this case, we respectfully submit that there was clearly a dispute as of at least when the EEOC charge was filed, well after the effective date of the Act, even if there was a dispute beforehand. And it seems that the appellees focus a lot on the fact that there could have been a dispute earlier in this proceeding or this circumstance, particularly when the facts giving rise to the claim arose. And do you agree with that, that there were prior disputes? It's possible. I don't think that just the claim arising would constitute a dispute. That seems to be one of the positions of the appellees. For example, if the claim arose and no one was aware of it or there was no contention between the parties, the appellees own definition. Here, in this specific set of facts, do you agree that disputes did arise prior to whether or not the EEOC complaint is also a dispute? Prior to that, do you agree that there were disputes that arose between Cornelius and CBS? Yes, I think that's fair to say based on the numerous complaints that Ms. Cornelius submitted regarding the alleged sexual harassment of one of the appellees. Under... Yes. What is your definition then of dispute? So Judge, we're fine using the definition that the appellees offer, which is based on and they say at page 13 of their brief, they define dispute as a conflict or controversy, especially one that has given rise to a particular lawsuit. There is a more recent, I believe from August, 8th Circuit Court of Appeals case that straightforwardly applied that definition to a lawsuit, and we think that that would apply here. It does cleanly apply to the filing of an EEOC charge, which initiated a conflict or controversy, namely an administrative or legal one, and that did literally give rise to this particular lawsuit based on the administrative adjudication of the charge that resulted in the right to sue notice. And so it's hard to see how the EEOC charge could not be a dispute, or the filing of a lawsuit could not be a dispute, even if there are earlier or other disputes that could be identified here. Under Supreme Court jurisprudence, including in Republic of Iraq v. Vietti and Smith v. Hill and earlier cases that are cited therein, the court makes clear that the word any is to be read broadly, and that the court does not have any authority to impose a limitation on it that's not in the statute. So here the word is unqualified, it does apply to any dispute, there's no reason why it would not apply to this dispute. Could a reason be that the EEOC complaint was not part of a continuing course of conduct by November 2021, since Ms. Cornelius had ceased being employed by CVS, there was no continuing course of conduct after November 2021? Yes, and we recognize that. I believe in the briefing we recognize that the claim accrued prior to the separation from employment, which is prior to the effective date of the act. But the language in the statute not only applies to when a claim arises or accrues, it applies to when any dispute arises or accrues. And so even had the claim fully accrued prior to the effective date of the act, which we recognize is probably the case, based on it being a continuing violation that couldn't have continued beyond the last date of employment, there's no question that a dispute came about after that. And so we do respectfully submit that it would be covered. This is any dispute. The lower court did disagree with the proposition that Ms. Cornelius alleged conduct constituting a sexual harassment dispute based on what we respectfully submit is a misunderstanding of the law. I think the EEOC amicus very thoroughly covered the history of this, what we submit is a legal error going back to this court's opinion in Andrews, and then readdressed in later cases such as Spanier-Gallegos, and we cited Bibi a lot. Bibi... I have a question. Yes, Judge. You can't get to the EFAA at all unless there's a valid arbitration agreement, right? Yes, Judge, I think that's right. The whole point, and it is under this 9, Chapter 9 or Title 9, it only applies on the presumption that there is an arbitration agreement. And of course, we do dispute whether there is an arbitration agreement on various grounds. We think under, for example, under this court's opinion in Guidotti, the court recognized that discovery was appropriate because there was a challenge to the validity of the formation of the agreement. Under this court's opinion, it may be optum Rx, this court ruled that discovery was appropriate because there was a challenge regarding unconscionability. That's another argument that we raised. And you argue... Go ahead, go ahead. Oh, no. You argue, though, that there was, even on the documents that are before the court, that there was no meeting of the minds. Yes, absolutely, and that could even be our principal argument. There is no meeting of the minds, no formation of an agreement. If there was an agreement... Yes. Are there any key terms that are only present in the policy guide or the training for your argument? Yes. In other words, something invalidates the meeting of the minds, and it's only... And that's because they're only present in the training guide or the training itself. Yes. So, for example, we would identify the opt-out provision or the opt-out notion as something that was not included in the purported arbitration policy. The lower court actually did recognize that the, quote, opt-out provision was not consistent, end quote. It was not included. There was also other important provisions that were not included in one of the other documents. So, for example, the policy document does not disclose that employees cannot be retaliated against for not opting out. And so we, in part of our argument where we're arguing that there was no arbitration agreement, we argue that there's no identifiable agreement, and the appellees have never specified where it is. The appellees only offer what we call a patchwork of inconsistent documents that make various inconsistent statements about important issues that would go to the heart of arbitration, including the opt-out provision, including... So, in the Max v. Pfizer case, the Supreme Court case in 2020, how does that apply here in this case? Yes, Judge. So, we think that that directly shows that there is no meaning of the mines here based on the fact that the appellees presented these arbitration-related documents as part of a so-called training. And the court in Scoos v. Pfizer said that if the way that an arbitration agreement is prevented can be mistaken for a training, then it would invalidate a meaning of the case. Here, we provided detailed arguments as to why we think that is the case, and that there was no meaning of the mines. This patchwork of documents could easily be mistaken for a routine training program. And to the extent there's a factual dispute over that, it certainly should not have been decided against Ms. Cornelius at this stage. The lower court did decide various factual disputes that it recognized against Ms. Cornelius. I think one that just really goes to the heart of the problem here was the district court recognizing either the contention or the finding that Ms. Cornelius, quote, was not aware that she was agreeing. So whether that was our contention based on the documents at that point, it remains a factual dispute that should not have been decided against Ms. Cornelius, particularly after the discovery. Let's assume for a minute that the act applies. You agree there was not an allegation of sexual assault, right? Yes, I believe it's not. So, we're talking about sexual harassment? Yes. Why did the allegations in her complaint constitute sexual harassment and not sort of garden variety discrimination on the basis of sex? So they may also constitute garden variety discrimination on the basis of sex. The reason that we characterize them as harassment is because we believe they cleanly fall into the language of ONCAL and this court's opinion in Bibby. More specifically, being aggressively rude to the person claiming there was sexual harassment, disparaging her work, sabotaging her, acting with a general hostility to the presence of a particular sex in the workplace. We pleaded quite robustly all different kinds of allegations that we think fall into all of those categories. And so that's why we're saying it was sexual harassment. We think that's the basis for the hostile work environment claim here. That's not to say that there were not individual acts of sex discrimination that could have been actionable on their own, but that would be the principal reason. And so we do think that under ONCAL and under Bibby, and again, Bibby might have been overruled on other grounds based on Bostock. I think Bibby decided that the allegations there went only to the employee's sexual orientation. But yes. We'll get you on rebuttal. Yes. Your time is up. Oh, yes. We'll hear from your friend.  From the EEOC. Thank you, and may it please the Court. Jim Driscoll McEachran on behalf of the EEOC. I want to focus on that question of sexual harassment here and focus on the district court's key legal error. FSASHA incorporates the sexual harassment standard from federal laws like Title VII as well as tribal and state laws. Under Title VII, sexual harassment is any unwelcome conduct because of sex that is sufficiently severe or pervasive to change the terms or conditions of employment. That's not the standard the district court applied here. The district court defined- But isn't that also in the complaint? I mean, is it really pled that there was severe and pervasive sexual harassment here? Yes, Your Honor. If this Court were to reach the question of whether Ms. Cornelius plausibly pled sexual harassment here, we believe the complaint does plausibly plead so. She certainly frames her claim in terms of sexual harassment, labeling the claim a hostile work environment. But more importantly, she alleges particular facts throughout her complaint that allege pervasive mistreatment because of sex. That is what's necessary for a sexual harassment claim. It can be pervasive mistreatment because of sex. I could go through the details of the complaint as well, but I do want to make sure that the legal standard that the district court used is highlighted here because it is unduly restrictive. Sexual harassment is not limited to explicit sexual advances as the Supreme Court held in Onkala, as this Court held in Andrews, and as courts around the country have made clear. That's particularly inappropriate under FSASHA, where Congress chose to incorporate explicit sexual conduct in the definition of sexual assault, but omitted any such reference in the definition of sexual harassment, which instead relies only on incorporated federal law like Title VII. The appropriate path then is to consider all the allegations that Ms. Cornelius included in her complaint, not taking them individually, as this Court instructed in Mandela and courts around the country. It's important that we look at the entire hostile work environment together, whether or not the individual acts are independently actionable. As this Court said in Andrews, if we highlight the individual scenes, we lose sight of the whole play. And that's the hostile work environment here. So in her complaint, Ms. Cornelius alleged that after decades of success at CVS and success at this particular location, that her manager, Mr. Patel, subjected her and other female employees to ongoing mistreatment because of sex. And she provides details of that complaint, of her allegations throughout the complaint, including that she told CVS that she had to put up with the hostile work environment every day. She then details the... Does unchallenged conduct have to have occurred because of the protected status? Yes, Your Honor. What is the evidence of that? And I couldn't help but note that you point out that CVS had some systemic problems handling sexual harassment complaints. I mean, I think you just dealt with complaints there. Was there... Does that amount to a showing of discriminatory intent with all those past cases? Well, at this point, all she has to do is allege plausibly at the highest, most demanding standard under FSASHA. And she's done so here, both by alleging specifically that she was mistreated because of her sex. She identifies... So, to take a step back, under Bibby, Andrews, and Oncall, a couple paths to showing causation include showing differential treatment between male and female employees and showing general hostility towards women in the workplace. Here she alleged facts that could plausibly lead to both those conclusions. First, she alleged that Mr. Patel subjected her to mistreatment because of her sex and subjected her and other female employees, again, specific allegations from her complaint, to different treatment than similarly situated male employees. She alleged that she was denied an employment... Before you go on, similarly situated, how do we know? I couldn't tell who was similarly situated to her. You're right, Your Honor. And to be clear, she just alleged that it was a male comparator. But again, this is at the complaint stage. But it was a similarly situated male. I get that it was a male. But how do we know that the... Can we read any of this saying that a person was similarly situated to the plaintiff here? I don't want to misspeak, Your Honor, and I take your point. She doesn't use those words, but she's also not required to use those words in her complaint. All she needs to do is include allegations that plausibly give rise to the interference that there was a hostile work environment here. And so, she does allege that she was treated differently than a male, that she was denied a promotion and... It has to be more than just any male, right? It has to be a similarly situated male, doesn't it? And if this case goes to discovery, certainly she'll have the opportunity to identify the male, demonstrate whether they were comparable in terms, all of those facts to come out. Right now, all we have is a complaint, a complaint that alleges in detail not just the denial of promotion and the different working conditions for female employees than male employees, and that other female employees were treated differently. But we also have allegations that could give rise to an inference of general hostility. It seems like the district court only addressed whether or not it was sexual in nature, but it didn't actually address or evaluate the sufficiency of the complaint or whether amendment would be futile. Is that right? Yes, Your Honor. That's correct. Was the sufficiency raised to the district court? I believe the focus was on this category question of whether this was sexual harassment or as the district court ultimately concluded whether this is sex-based discrimination. And to the Chief Judge's point about causation, when the district court concludes that this is not sexual harassment, if I may complete my answer, it instead concludes that it's sex-based discrimination. Sex-based discrimination is discrimination because of sex. So the district court seemed to have no problem inferring that the conduct that Ms. Cornelius endured at CVS was caused by her sex. It instead seemed to stop at the issue of whether or not that conduct was explicitly sexual. That's not the standard under Title VII. It's not the standard under FSASHA. So we'd ask this court to reverse and remand for further proceedings under the appropriate standard. Let's stipulate that there doesn't have to be a sexual or sexual desire aspect. But there's a sexual harassment is a form of sex discrimination. Yes, Your Honor. But the converse isn't true, is it? All sex discrimination isn't also sexual harassment, correct? That is correct, Your Honor. How do we know the difference in any given case, whether someone who pleads essentially a sex discrimination case has crossed the line into sexual harassment? Your Honor, there's a couple different answers to that. We can start with taking the complaint with what the complaint alleges, which is not a single act of discrimination. So oftentimes you'll see, so for example, the Supreme Court in Morgan distinguished between individual acts of discrimination. So it happens essentially one time in a hostile work environment, which is a pattern of acts over a period of time. Any one of those acts may not be actionable. But you get the pervasive part. Sure, yes. And sometimes, exactly. So pervasive would be the most common. But there could be a sliding scale, of course, between severity and pervasiveness. But so here, Ms. Cornelius alleged a pattern of mistreatment because of sex. That can include independently actionable discrimination. So we do mention that she's included the denial of promotion and being subjected to unfavorable working conditions. You can see that in some of the cases from this circuit and others. So like the O'Rourke case of the first circuit has a footnote saying that it was an error not to conclude a forced transfer as part of a hostile work environment. But here it is, that allegation of an ongoing pattern that really fits it into the hostile work environment theory of sexual harassment. Because it was pervasive or because it was severe? Or both. There doesn't seem to be arguments about the relative severity. As the panel has pointed out, there wasn't a lot of dispute about how it would meet the actual standard for sexual harassment. But at minimum, we do see allegations of ongoing mistreatment that would go towards pervasiveness. Thank you, counsel. Thank you. We'll hear from appellees, counsel. Good morning, your honors. May it please the court. My name is Christine Grady-Darowitz. And here with my colleague, Heather Pierce, we're happy to represent appellees, CVS, and Mr. Patel. The district court's decision in this case should be affirmed because Ms. Cornelius agreed to arbitrate her claims and because the ending forced arbitration of Sexual Harassment and Sexual Abuse Act does not apply to those claims. Ms. Cornelius alleges that she was discriminated against in 2019, 20, and 2021, culminating in her resignation in November of 2021. The EFAA is not applied retroactively. By its terms, it applies to any dispute or claim that arises or accrues on or after the effective date of the act, which is March 3, 2022. Under no set of facts or circumstances, and under no plain reading of the EFAA, is Ms. Cornelius entitled to invoke the act. How about the Eighth Circuit case construing this? Your adversary cited it. We've looked at it. I mean, it doesn't involve when actually sort of the parties are engaged and there's actually a dispute. That doesn't reach into the proper timeframe to allow the plaintiff to take advantage of the EFAA? Not in this case, Your Honor. I'm going to call it the Cipolli case because I'm not entirely sure how to pronounce the plaintiff's name in the Eighth Circuit case. In the Cipolli case, the Eighth Circuit really based its conclusion on its determination that the parties had not taken contrary sides as of the effective date of the act. And interestingly, the court pointed out that there apparently was a letter that Cipolli had sent back to plaintiff's lawyers, but that letter was not part of the record. So the record that was in front of the district court there and then, of course, in front of the Eighth Circuit ended with these letters from plaintiff's counsel asserting potential violations of law. I'll characterize it that way. We don't have that here, Your Honor, because it is undisputed that Ms. Cornelius complained internally at CVS. And in Ms. Cornelius's language, CVS sided with Mr. Patel. So if this court were to determine that a dispute requires that the parties take opposing sides, if you will, that happened here. That happened prior to Ms. Cornelius's resignation in November. Well, it's claim or dispute, right? I'm sorry. Claim or dispute, right? Yes. And the claim, I don't think there's a question about, but dispute might be a question. Agreed. The notion that the claim has accrued, Ms. Cornelius has conceded that her claim accrued prior to the effective date of the act. So what we're looking at is whether or not the dispute arose prior to the effective date of the act. So here, as you said, the allegation is that CVS sided with Patel. Yes. What if a complainant makes complaints and the employer just does nothing, just ignores them? Is there a dispute? Could there be a dispute? Yes. If you look at the Eighth Circuit case, the Eighth Circuit may disagree with me. Yeah. The Eighth Circuit may say, no, there can't be a dispute. What I would say, though, in looking at the language of this law, it says dispute arose. And this goes to the argument that Ms. Cornelius's counsel made. A dispute arises at a point in time. And arises means begins to occur, begins to exist. So the dispute arises when the conduct occurs. The dispute is the underlying facts leading to the claim, as the Barnes case, the Western District found. So in response to your question, Judge Porter, yes, there can be a dispute that arises prior to in your situation where the employer is silent or the employer ignores the complaints. Our argument is yes, there still can be a dispute that has arisen because the conduct occurred. Recognize that the Eighth Circuit may find that differently, but I think that there is a clear delineation in the EFAA to say that Congress is looking at when did the dispute arise. Arise can't be ignored. We focus a lot on the definition of dispute. I think we've now all agreed it's conflict or controversy, but we need to look at the word arise as well. But if it's a continuing course of action, then there can be multiple instances where it arises. So what is CBS's position as the absolute last? If there are a series, the absolute last date that a dispute arose on the date of her resignation And why does not the filing of the EEOC also constitute another event where a dispute arose? The filing of the EEOC charge is an event, but it's not when the dispute arose. Again, I think the notion that you can have, and I want to distinguish the continuing violation theory, which I will, but the notion that you can just have a series of disputes that all relate to the same underlying facts and circumstances seems to me fundamentally inconsistent with Congress's applicability note. There can, of course, be continuing violations, particularly in cases of hostile work environment sexual harassment, and the jurisdiction on that is, you know, there are scores of cases. So in other words, the EEOC complaint is about a dispute that had already arisen? Absolutely. That is our position, Your Honor. Yes. See, if I could shift you along a little bit. I asked your adversary about, well, hey, if there's no arbitration agreement, we don't have to worry about this, okay? Let's talk about the applicability of the Scuse case, which I'm sure you're familiar with. Yes. Now, you know, the holding helps you, but the reasoning may not. So let's think a little bit deeper. We have to look at the content and tone, which I don't know if we're the right court to even do that. But, you know, isn't there an argument that there is no agreement because of the circumstances here, the training, and the tone of that? No, Your Honor. I don't believe that there is an argument or a valid argument. The CVS's process includes robust training, provision of the policy. There's no dispute that Ms. Cornelius participated in the training. There's no dispute that she acknowledged the policy. The Scuse case talks about the fact that the training aspect of an arbitration program does not undermine the validity of the agreement to arbitrate claims.  You have to look a little closer at the tone and really at the tone and the content. So it's not a bright line. It's not a bright line, Your Honor, but there's nothing in the record here to suggest that CVS's tone or content invalidated the overall terms and conditions set forth in the training and in the arbitration policy, which, of course, need to be read together. The idea, and Your Honor's point at us and asked us to be prepared to talk about Young versus Experian, there is no dispute of fact in the record regarding this arbitration agreement. Ms. Cornelius's counsel made legal arguments with respect to whether there was a meeting of the minds, argued that the terms were confusing, argued that the terms were in conflict, but there's no factual evidence of record that Ms. Cornelius was confused. Is meeting of the minds illegal or a factual termination? Meeting of the minds is, I would say it's both in some circumstances. Here, there are no facts to suggest that Ms. Cornelius did not understand. There are legal arguments only. She did not submit a declaration in the district court. She did not amend her complaint. There's nothing to suggest that she did not understand what was happening here. I'd like to ask you a few questions about what the record does reflect. So turning your attention to one of the exhibits, it's page 62 of the appendix that reflects her training record. It looks like on the date she did this that she also did two other trainings. Am I reading this exhibit correctly? Yes, Your Honor. I believe that you are, and I'm not going to find it very quickly, but I know what you're referring to. Okay. I was just trying to understand because there aren't any titles to these particular columns. Yes. I couldn't tell. Okay. So that does reflect that. As far as the meeting of the minds, New Jersey case law, you know, talks about when there is a meeting of the minds and when someone affirmatively gives up their rights. And one of the factual issues that Ms. Cornelius brought up was the inability to print, and it's actually not clear to me. I looked at all of the training slides as well as the policy guide and the policy itself. The policy guide says don't print, but at the time she took it, could she download these documents? I know the policy itself says go to HR, you can get the policy. Could she have obtained a copy of the policy guide and of the training slides themselves, and is that in the record? She could have obtained them from human resources, Your Honor. I'm going to apologize and say I'm not entirely sure where that is in the record. Okay. I don't know that I can point you to a page I can find it on. Judge Chung had a good question, but let me ask you sort of step back one. Does it matter if it was printable or not? No, I don't think it is, Your Honor. Ms. Cornelius had every opportunity to participate in the training. She did participate in the training. In terms of the agreement, obtaining the agreement, did it matter whether you were able to print or not print? In terms of whether she agreed to the terms of it, are you asking does that go to the formation of the contract? Well, yeah, but one of her complaints, which I believe is an argument that that's something that needs discovery, is that I wasn't able to get a printed copy of this. Did she need to have a printed copy of this? No, Your Honor, because she could access the digital copy. That's what I'm asking. Correct. Yes, agreed.  Yes. So there was a digital copy that she could always freely access. Through the HR website. And when you say a copy, I just want to be clear, we're talking about the policy itself, the training guide, as well as the training slides. All three were available digitally on the HR. I am not certain about the slides. Okay, but you are certain about the guide and the – The guide and the policy. The guide and the policy. And you believe that is in the record? I will confirm that, Your Honor. All right. If we bracket the meeting of the minds issue and the timing issue, why don't the allegations in this complaint pass from sex discrimination to sexual harassment? Because, Your Honor, they don't demonstrate a severe or pervasive hostile work environment that substantially affected the terms and conditions of employment, a standard that's been in existence, you know, since Meritor versus Meritor Savings Bank. The allegations in the complaint are sex discrimination allegations, failure to provide a promotion, failure to give a pay increase, text messages that were rude, requiring that she shovel the front sidewalk of the store. They are not of the type that constitutes sex harassment. This court is in a very unique position of having to decipher or differentiate between sex discrimination and sex harassment at a pleading stage. We don't typically do this, but now that we're grappling with the EFAA, we are doing it routinely. And to your point with my colleague earlier, sex harassment is a subset of sex discrimination. It does need to meet different standards. So what would be an example? Can you give us, respectfully, I don't think UNCAL does the work here, but what would be an example of a case that we could look to to define the difference between harassment and discrimination? Do you have one? I would refer the court to the court's decision in Nickin versus Mainline Health that talks about the very particular requirements of sex harassment. Respectfully, Your Honor, there's not a lot of case law differentiating between sex discrimination and sex harassment because we haven't had to do it. But the Nickin case, which is probably the most recent Third Circuit case, I would say, that really delved into the question of what type of conduct and what type of allegations are necessary to state a claim for sexual harassment, I think is a very well-considered decision by this court. Did you not forfeit the sufficiency argument? Understanding that a lot of the play below was whether it had to be of a sexual nature or that's what the district court considered. But I didn't see in your motion to compel-slash-dismiss anything challenging the sufficiency. Your Honor, our position is that we did not forfeit it. The district court raised it in her or brought the issue forward in her ruling. And, of course, Ms. Cornelius and the EEOC have brought it to this court. And we certainly believe that we have every right to respond to the arguments that were made. Okay, thank you. Thank you very much. We'll hear from Mr. Kennelly. Good morning. Michael Kennelly on behalf of Retail Litigation Center and the Chamber of Commerce. Thank you for the opportunity to participate in argument today. I'd like to make two key points. First, this distinction between sex discrimination and sexual harassment is critical to the correct application of the EFAA. And second, plaintiff's allegations don't fall on the sexual harassment side of that line. I'll take those two points in order. Congress confined this statute to sexual assault and sexual harassment disputes. That wasn't an accident. Even after the statutory amendment, the Federal Arbitration Act reflects a strong policy in favor of enforcing arbitration agreements according to their terms. But in 2021, Congress came together in a broad bipartisan fashion to carve out these two specific categories of misconduct, which many believed were being wrongfully confined to the generally non-public forum of arbitration. And this measure followed several widely reported incidents of employees who came forward as victims of sexual assault or sexual harassment in the workplace and were denied the ability to pursue relief in court. Of course, it also arose in a context where many policymakers feel that arbitration of employment disputes should be curtailed more generally. But that wasn't the viewpoint that Congress adopted in the EFAA. Prior proposals of this legislation had sought to restrict arbitration of any sex discrimination dispute, but those proposals died as unenacted bills on Congress's floor. It was only after the shift to sexual assault and sexual harassment that this statute became law. And that naturally raises the question that's been discussed a bit today, what's the difference between sexual harassment and sex discrimination? A long line of cases answer that question. Sexual harassment is a particular species of sex discrimination, but the difference is about whether the change in the terms and conditions of employment is explicit or implicit. A hostile work environment claim involves conduct that is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. That's the phrase that the Supreme Court used in Meritor and then repeated in the Farragher case. And that's why we see in most hostile work environment cases really bad conduct, epithets, slurs, obscenity, lewd displays, sexual remarks, physical contact. And those are present in even the cases that plaintiff and the EEOC identify from this court and others. Now, that's not to say that sexual desire has to be present in every case of sexual harassment, but you do have to have objectively offensive or abusive conduct. I think the thing that's concerning about the EEOC's position in this case that we heard today is that you could count sex discrimination allegations like failure to promote when you've promoted a male employee who may or may not be similarly situated, but set that aside. That's a classic sex discrimination claim because it involves a concrete term or condition of employment, the job position and salary. If that's part of what can suffice to allege a sexual harassment claim and get out of an arbitration agreement, then it's going to be hard for me to imagine too many plaintiffs with sex discrimination cases who can't just say, and if you take all these things together, we have sexual harassment, and therefore arbitration is unwarranted under the EFAA. So what do we look for to distinguish the two types of claims? Well, I think you don't consider those concrete episodes as part of a hostile work environment. So concrete episodes like failure to promote based on sex, and here most of what's in the complaint that actually could be suggestive of animus based on sex is something like that, a very concrete employment decision. So in the complaint, a performance review that was used as a basis for denying plaintiff a job promotion, but was not an impediment to a male colleague getting a promotion. That is clear sex discrimination, what maybe we call garden variety sex discrimination, and if that can be counted towards pleading a claim of sexual harassment, then I don't think that this distinction I've been trying to draw will ever have effect in real life. I understand your concern, but where are the definitions? And it seems to me that you're having us look to legislative history, which is not our first choice. Where else can we find a definition that's going to help us maybe make some bright lines here? Well, I think actually the EEOC's website, which we cited in our brief, as being somewhat similar but different a little bit from what the district court relied on, actually I think gets at the core common sense idea of when you have sexual harassment and when you have sex discrimination. I also think that the Bibby case from this court gets at this as well. In that case, the court didn't have to address severe or pervasive because it found there was no sufficiently shown animus, but it did quote on kale for the proposition that plaintiff, quote, must always prove that the conducted issue was not merely tinged with offensive sexual connotations but actually constituted discrimination because of sex. That's in order to state a sexual harassment claim. I mean, there the court was saying offensive sexual connotations were necessary but not sufficient. So I share CVS's counsel's concern that this issue hasn't really come up before. Courts haven't had to sort sex discrimination broadly from sexual harassment because it's not normally been required. I mean, even the example that the EEOC's counsel cited today of a case involving forced transfer, after the Supreme Court's recent decision in Muldrow versus the city of St. Louis, a transfer is now a change in the terms and conditions of employment. That's just regular sex discrimination. So it's a difficult line to draw, but we would urge the court. There is line drawing in the hostile work environment claims. The hostile work environment claim is a specific type, and so that might be one line, correct? Yes, and that's what I'm trying to do is give some content to the difference between a hostile work environment versus other sex discrimination. I think the hostile work environment kind of claim is one where just working in the presence of behavior that is so offensive to a reasonable person, no one should have to work in that kind of condition. That's when the terms and conditions of employment have been implicitly changed enough to provide a hostile work environment. And we're getting beyond mere friction between professionals in the workplace, and we're getting to really offensive conduct such as we see in the case law. Thank you. Thank you, counsel. Thank you, Your Honors. And we'll hear from appellant's counsel on his rebuttal. Thank you. Something, a concept that may be helpful here is distinguishing harassment from sexual harassment. In this case, we did argue that it's clear that there's at least harassment here, and we gave specific examples of things such as dismissing, abusing, destroying morale, minimizing, targeting. And so the question is, is that harassment, sexual harassment, depends on whether it's because of sex. And in this case, we did clearly allege that the motive behind the harassment was sex-based and provided ample evidence of that, at least in our allegations. For example, specific complaints from this appellant and other employees regarding the sexually discriminatory attitudes of one of the appellants, as well as additional subsequent complaints from appellant that show that this was because of sex. Notably, the motivation behind the harassment is a factual question, and so we pleaded it properly and it needed to be credited to Ms. Cornelius at the motion to dismiss stage. We believe that Wishkin and Hurley both show that it's a factual question that can't be decided against the appellant at that stage. So APOC's, I guess, I don't know how to describe it, statement about sexual harassment says it can include unwelcome sexual advances and so on. And then it says, but harassment does not have to be of a sexual nature and can include offensive remarks about a person's sex. For example, it's illegal to harass a woman by making offensive comments about women in general. But even that seems to suggest some kind of objective, you know, comments being made. You can't just, you know, as the plaintiff, you can't just sort of speculate about Mr. Patel's or whoever state of mind. You have to have kind of show the comments. Right. So how can you how can you show sexual harassment in the absence of those types of comments? Well, we believe that we give a lot of evidence that could show sexual harassment in the absence of explicit comments like that. For example, allegedly, Mr. Patel himself bragging about not facing consequences for discrimination against women. I think that's the appendix at paragraph 37, as well as the whole pattern of behavior in treating men and women differently. There was a factual question raised during this argument over whether that male employee was similarly situated. Another reason why the dispute could not have been decided against Ms. Cornelius at the motion to dismiss stage. We do think the motive really does carry the issue for Ms. Cornelius, at least at this stage, because we properly pleaded it. We also provided other allegations that directly support it. Do you agree that if the allegations sound in sex discrimination, but you characterize the claim as sexual harassment, that that alone won't get you over the bar. You can't just rely on the characterization of the claim. Yes. And the harassment does need to be pervasive and severe. And in this case, we believe the allegations that that showed that it was. And I see my time has expired. There was an issue with the young issue. Your adversary. We sent you a note about it. Your adversary did. Yes. So we do think that young directly supports our position here that discovery discovery was warranted. Notably, young is clearly distinguishable from this case where there was not a dispute over the formation of the validity of the agreement. Earlier in the briefing, we cited cases such as maybe Optima X and Guidotti where there were disputes over those exact issues. Here, we clearly raise them for the district court and did not have a chance to get discovery on them. Young, again, is completely different because there was. What do you need discovery on? And where have you asked for it? So we did. We did cite Guidotti and said that we must be given discovery. I believe that's the language of the case. And I believe that's in footnote 43 in one of our briefs that is in the appendix. And what we would need it on is a whole host of issues. Judge, so for example, whether there's a meeting of the minds. The training issue is the first issue that we presented to the district court as showing that there was no agreement here. We think that what we showed about the documents suffices to show there's no agreement. What additional documents are out there or that you think? For instance, you said, you know, you need discovery on whether or not this was printable. That was one. And understanding you didn't have the benefit of young before, but you got the policy. You've got the guide. You've got the slides. You know, are there e-mails you think? What exactly is in addition, if there are to the printing, are the factual disputes? And how will discovery help you with those disputes? So we do believe we would be entitled to any e-mails on the topic of how this training was presented and whether there were employees that were confused. We think we would be entitled to discovery on opting out. And particularly the appellee's position of whether they're bound by their own opt out provisions or whether it's just Miss Cornelius making that provision illusory. We believe there's a lot of issues for discovery, including whether the documents were confusingly embedded, but not viewable contemporaneously. And that's a quote from the district court. I believe the appendix at page 88. And so witness testimony would be relevant to that question. And whether the person receiving these documents could compare them, could see the inconsistencies between them. There's a lot of gaps along those lines. We think there's additional discovery would be regarding whether the statements that we identified in the documents are materially misleading. We cited cases showing that that's a fact that needs to be decided. And if they were, we would respectfully submit there's no agreement. So we think, and this is at app pages, I think, 65 to, let's see, 65 to, I think, 78. We raise all these issues regarding the inconsistencies in documents, the way that they were presented, the fact that they can be misconstrued for a routine training program. And so I believe we did respectfully submit some examples of discovery that would be warranted. But it wouldn't be our burden to do that at this stage. We respectfully submit that that's the discovery process that should have unfolded in the district court. Are those pages that you just referenced your response to the motion to dismiss? Yes, they are, Judge, yes. And, yes, raised directly in response and heavily cite all of the alleged documents here that we noted where we respectfully submit inconsistent patchwork of statements regarding arbitration. But that doesn't have to do with, those are the previously disclosed documents, right? Yes. So what more discovery would you need? So just for example, Judge, discovery regarding the availability of viewing the documents during the process of doing this training. And so, again, the district court at App 88 recognized the factual dispute regarding whether, quote, the documents were confusingly embedded but not viewable contemporaneously. And so that would be witness testimony, for example, that we discovered on that, whether that's the case. Your Honors also mentioned the issue regarding printing, where it seems the appellees are making a certain assertion regarding the availability of documents when there's no evidence on the fact that they were permitted to be printed. One of the documents, as Judge Chung mentioned, says cannot be printed without prior written approval. And we noted in our briefing that there's no evidence of prior written approval in the record. So even just the presentation of the documents themselves, the availability of printing, as well as witness testimony, and, of course, regarding the opt-out provision that the district court itself recognized, quote, opt-out provision was not consistent. And the appellee's own view of whether it binds them or whether it only binds the appellee in this way that we've identified as oppressive and would go to our argument of substantive inconstitutability. All right. Thank you, counsel. Thank you. We thank counsel for their excellent arguments, both written and oral today. We'll take the case under advisement and we'll ask the court to adjourn for the day. And we'll meet you at sidebar as well if you're amenable to that. Thank you.